## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CHRISTIE POITRA,

Plaintiff,

v.

MICHIGAN STATE UNIVERSITY;
MICHIGAN STATE UNIVERSITY
BOARD OF TRUSTEES; SAMUEL L.
STANLEY, JR.; SATISH UDPA; LOU
ANNA K. SIMON; JOHN M. ENGLER;
RONALD L HENDRICK; ROBERT
KENT; TANYA JACHIMIAK; JOHN
NORDER; and QUENTIN TYLER; in their
official and individual capacities,

Defendants.

Case No.

Hon.

Elizabeth K. Abdnour P78203
ELIZABETH ABDNOUR LAW, PLLC
Attorney for Plaintiff
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Fax: (517) 292-0067
Email: elizabeth@abdnour.com

Karen Truszkowski P56929
TEMPERANCE LEGAL GROUP, PLLC
Attorney for Plaintiff
1100 W. Saginaw St., Ste. 4A-1
Lansing, MI 48915
Telephone: (844) 534-2560
Fax: (800) 521-6527
Email: karen@temperancelegalgroup.com

## COMPLAINT AND JURY DEMAND

Plaintiff CHRISTIE POITRA, by and through her attorneys, ELIZABETH ABDNOUR

and KAREN TRUSZKOWSKI, hereby files the following complaint for sex and disability

discrimination and retaliation and violations of her constitutional rights in violation of Title IX, 20

U.S.C. §1681; Title VII, 42 U.S.C. § 2000e-2; The Americans with Disabilities Act, 42 U.S.C. §

12111; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701; the Fourteenth Amendment

1

to the U.S. Constitution; 42 U.S.C. § 1983; Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.*; and Michigan's Persons with Disabilities Civil Rights Act, M.C.L. § 37.1101 *et seq.*, against Defendants as captioned above.

## INTRODUCTION

*           *           *

*"MSU POINTS OF PRIDE: MSU has several excellent academic centers that address diversity, equity and inclusion as a part of their core mission. Three centers of note are the Julian Samora Research Institute, the Native American Institute and the Center for Gender in Global Context. Research and scholarship supported by these centers plays a crucial role in the overall landscape for diversity academic work at MSU."*

*-MSU Diversity, Equity & Inclusion: Report and Plan[1]*

*           *           *

1. Dr. Christie Poitra is a nationally recognized expert in Native American studies.  She has been employed in the Native American Institute ("NAI") at Michigan State University since October 2015, serving as Interim Director since October 2018.  In her time at NAI, Dr. Poitra has been awarded $1,043,157.00 from the National Science Foundation and other granting agencies, as Primary Investigator and Co-Primary Investigator; planned, developed, supported and implemented community-based collaborative research, partnerships and programming with: tribal colleges, Indigenous communities, tribal governments, urban centers, and K-12 schools throughout Michigan; brokered grant-funded, cross-unit and faculty research partnerships and faculty development opportunities for MSU; authored numerous grant proposals, articles, reports, invited talks and

---

[1] *Diversity, Equity & Inclusion Report and Plan*, Michigan State University, p. 33 (Aug. 10, 2021) https://president.msu.edu/_assets/documents/DEIreportandplan_081021.pdf.

presentations; managed 10 accounts and administered 2 endowments; directly supervised staff, consultants, undergraduate and graduate students; collaborated on outreach, research and grants with 21 faculty, 5 academic staff, 4 post-doctoral students; 8 tribal governments, 2 tribal colleges, 4 K-12 schools, and 7 non-profit organizations.

2. It is not an exaggeration that there is no one with the breadth of experience, scholarly output, and depth of community relationships in the field of Native American studies comparable to Dr. Poitra in the entire state of Michigan.  MSU regularly touts the work of NAI and of Dr. Poitra specifically to demonstrate its commitment to Native American studies.  Dr. Poitra even wrote the official land acknowledgment used by MSU.

3. Due to MSU budget cuts, Dr. Poitra has built this impressive professional oeuvre while doing the work of at least three full time employees in NAI.  Even more impressively, Dr. Poitra has achieved all this while spending the past three and a half years fighting off discrimination, harassment and stalking from multiple supervisors, navigating the onerous and lengthy MSU Title IX and discrimination investigation process; going through complaint processes with both the U.S. Department of Education and the Equal Opportunity Employment Commission to try to seek accountability for the abuse she has suffered; and dealing with retaliation from her superiors at MSU.

4. Instead of protecting and supporting Dr. Poitra, MSU has left Dr. Poitra continuously exposed to discrimination, harassment, and retaliation; failed to enforce its own no-contact directive against her abuser; forced her to shoulder significantly more work than any reasonable individual should be expected to perform; denied her equitable pay and professional title; and shrunk the budget of and even threatened to dissolve NAI.

**JURISDICTION AND VENUE**

5.  This Court has original jurisdiction over Plaintiff's federal claims under 29 U.S.C. § 626, 28 U.S.C. § 1343, and 28 U.S.C. § 1331.

6.  The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

7.  Pursuant to 28 U.S.C. § 1391(b), venue lies in the Western District of Michigan as the events giving rise to this action occurred in East Lansing, Michigan.

**PARTIES**

8.   Plaintiff Christie Poitra is a resident of Ingham County, Michigan, and at all relevant times was an employee of Michigan State University.

9.  Defendant Michigan State University ("MSU") was at all relevant times and continues to be a public educational institution in Ingham County, Michigan, organized and existing under the laws of the State of Michigan.

10. MSU receives federal funding and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681(a).

11. MSU Board of Trustees is the governing body of MSU.

12. Defendant MSU and Defendant Board of Trustees are hereinafter collectively referred to as "the MSU Defendants."

13. At all material times before January 31, 2018, Defendant Lou Anna K. Simon, in her official capacity, worked within Ingham County, State of Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of her employment and her employer.

14. At all material times before January 31, 2018, Simon was the President of MSU.

4

15. At all material times between January 31, 2018, and January 17, 2019, Defendant John M. Engler, in his official capacity, worked within Ingham County, Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

16. At all material times between January 31, 2018, and January 17, 2019, Engler was the Interim President of MSU.

17. At all material times between January 17, 2019, and August 1, 2019, Defendant Satish Udpa, in his official capacity, worked within Ingham County, State of Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

18. At all material times between January 17, 2019, and August 1, 2019, Udpa was the Acting President of MSU.

19. At all material times after August 1, 2019, Defendant Samuel L. Stanley, Jr., in his official capacity, worked within Ingham County, State of Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

20. At all material times after August 1, 2019, Stanley was the President of MSU.

21. At all material times until June 30, 2021, Defendant Ronald L. Hendrick, in his official capacity, worked within Ingham County, State of Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

22. At all material times until June 30, 2021, Hendrick was the Dean of the College of Agriculture and Natural Resources at MSU.

23. At all material times from June 18, 2018, to February 2, 2020, Defendant Robert Kent, in his official capacity, worked within Ingham County, State of Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

24. At all material times from June 18, 2018, to February 2, 2020, Kent was MSU's Interim Title IX Coordinator.

25. At all material times from February 3, 2020, to October 1, 2021, Defendant Tanya Jachimiak, in her official capacity, worked within Ingham County, State of Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of her employment and her employer.

26. At all material times from February 3, 2020, to October 1, 2021, Jachimiak was MSU's Title IX Coordinator.

27. At all material times Defendant John Norder, in his official capacity, working within Ingham County, State of Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

28. At all material times Norder was an employee of MSU. At all material times prior to August 2018, Norder was the Director of the Native American Institute at MSU; and at all relevant times Norder was an Associate Professor of Anthropology at MSU.

29. At all material times Defendant Quentin Tyler, in his official capacity, worked within Ingham County, State of Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

30. At all material times prior to June 1, 2021, Tyler was Associate Dean and Director for Diversity, Equity, and Inclusion for the College of Agriculture and Natural Resources. At all material times after June 1, 2021, Tyler was Director of MSU Extension.

## APPLICABLE LAW AND POLICY

31. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 (a), states that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…

32. Title IX is implemented through the Code of Federal Regulations.  *See* 34 C.F.R. Part 106.

33. 34 C.F.R. § 106.8(b) provides:

> …A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

34. In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

35. In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student, rather than a teacher.

36. *Davis* held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is:

> a) deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and

b) the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

*Davis*, 526 U.S. at 1669-76.

37. In *Kollaritsch v. Michigan State University Board of Trustees*, 944 F.3d 613 (6th Cir. 2019), the Sixth Circuit Court of Appeals held that, in order to be liable for deliberate indifference under Title IX, a school's response must have failed to protect a plaintiff against actual further harassment: "…a student-victim plaintiff must plead, and ultimately prove, that the school had actual knowledge of actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable sexual harassment against the student-victim, which caused the Title IX injuries." *Id.* at 618.

38. In *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), the Supreme Court held that retaliation against a person who complains about sex discrimination is itself a form of discrimination "on the basis of sex" forbidden by Title IX.

39. The First Amendment to the United States Constitution provides that Congress shall make no law "abridging the freedom of speech." U.S. Const. amend. I.

40. In *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), the Supreme Court held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."

41. In *Healy v. James*, 408 U.S. 169 (1972), the Supreme Court held that the First Amendment applies with the same force at public universities as at other educational institutions.

42. The Fifth Amendment to the U.S. Constitution provides that "No person shall be… deprived of life, liberty, or property, without due process of law…." U.S. Const. amend. V.

43. The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

44. Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq*., states that it shall be an unlawful employment practice for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

> 42 U.S.C. § 2000e-2(a).

45. Under Title VII, 42 U.S.C. § 2000e-2, the term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person.

46. Under Title VII, 42 U.S.C. § 2000e, the term "employee" means an individual employed by an employer.

47. The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 *et seq*., states that:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

> 42 U.S.C. § 12112(a).

48. Under the ADA, the term "covered entity" means an employer, employment agency, labor organization, or joint labor-management committee.

49. Under the ADA, 42 U.S.C. § 12111, the term "employer" is defined as:

> ...A person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this subchapter, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.
>
> 42 U.S.C. § 12111(5)(A).

50. Under the ADA, the term "discriminate against a qualified individual on the basis of disability" includes but is not limited to:

> (1) Limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee; …
>
> (3) Utilizing standards, criteria, or methods of administration--
> (A) that have the effect of discrimination on the basis of disability; or
> (B) that perpetuate the discrimination of others who are subject to common administrative control.
>
> 42 U.S.C. § 12112(b).

51. Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 701 *et seq*., provides that:

> No otherwise qualified individual with a disability in the United States, as defined in Section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…
>
> 29 U.S.C. § 794(a).

52. Section 504 defines a "program or activity" to include all operations of a college, university, or other postsecondary institution or a public system of higher education.  29 U.S.C. § 794(b)(2)(A).

## FACTUAL ALLEGATIONS

53. Dr. Christie Poitra is the Interim Director of the Native American Institute ("NAI") at MSU. Poitra has been an employee in the NAI since October 2015.

54. Dr. Poitra's professional record and educational achievements are impressive.

55. Dr. Poitra holds a doctorate degree in educational policy from MSU, a Master of Arts degree in American Indian Studies from UCLA, and a Bachelor of Arts degree in Legal Studies from UC Berkeley.

56. While at UC Berkeley, Dr. Poitra was awarded two prestigious awards through The Achievement Award Program and the Leadership Award Program.

57. While at UCLA, Dr. Poitra received the Graduate Opportunity Fellowship, the Gold Shield Fellowship, and a grant through the Institute of American Cultures Research.

58. While pursuing her doctorate at MSU, Dr. Poitra received a $150,000 fellowship as a MSU Distinguished Fellow.

59. In addition to her academic credentials, Dr. Poitra has more than fifteen years of experience working directly with Native communities.

60. Prior to her work at NAI, Dr. Poitra worked as an elementary school teacher in a reservation public school and was appointed as part of the MSU Office of K-12 Outreach, where her work focused on instructional leadership in diverse school contexts.

61. Throughout her career, Dr. Poitra has authored and co-authored numerous scholarly articles in her area of expertise.

62. Dr. Poitra is well-known within her academic community, and regularly attends events and speaks at conferences and on panels about her work with Indigenous communities.

63. Through her work with NAI, Dr. Poitra has secured more than $1,000,000 in Federal grant money to aid the program at NAI.

64. In addition to her duties at NAI, Dr. Poitra has participated in numerous committees both within and outside of MSU.

65. Dr. Poitra also serves as a mentor to students at MSU.

66. Dr. Poitra is Latina and a descendant of the Turtle Mountain Band of Chippewa Indians.

### *Native American Institute's Functions and Placement at MSU*

67. NAI is a small, unique unit at MSU.

68. NAI's mission is two-fold, first to engage in scholarly pursuits such as research and writing, and second to engage and work directly with Native communities.

69. In its most recent strategic plan for Diversity, Equity, and Inclusion, MSU described the work of NAI as playing a "crucial role in the overall landscape for diversity academic work at MSU."[2]

70. Working directly with Native communities on collaborative scholarship and programming, the NAI's mission is unlike any other throughout the country, and a position similar to that at NAI is impossible to replicate elsewhere.

71. Even nationwide, the group of academics doing work in the same field is a small, tightly knit community.

72. The function of NAI is also directly tied to the Native communities with which it works.

---

[2] *Diversity, Equity & Inclusion Report and Plan*, *supra* note 1.

73. The relationships between Dr. Poitra and local Native communities are essential to NAI's success.

74. NAI is a unit within MSU's College of Agriculture and Natural Resources ("CANR").

75. CANR is an essential part of MSU's campus, with its purpose to realize the goals of a land grant university.

76. CANR includes a vast number of departments within MSU, ranging from Forestry to Interior Design.

77. Since its inception, CANR has been led and directed by mostly white males until Defendant Hendrick left MSU for Texas Tech University and Dr. Kelly Millenbah was appointed Interim Dean on July 1, 2021.

78. CANR's administration does not reflect the diverse communities it is meant to serve and does not reflect the diverse student body enrolled in its programs.

79. When Dr. Poitra first began working at NAI, Defendant Norder was serving as Director of NAI.

80. Norder held the Director position at NAI from 2015 until his removal in 2018.

81. While he was director of NAI, Norder also had a position at the MSU Museum.

82. Norder continues to be an Associate Professor of Anthropology at MSU as of the date of filing.

83. While Norder was director of NAI, Dr. Poitra served as Assistant Director and reported directly to Norder.

84. Each time a faculty or academic staff member is hired, whether in CANR or another college, the employee must sign a contract and agree to abide by the rules and regulations of the MSU Faculty Handbook.

85. The faculty handbook prohibits discrimination and harassment, and further states that "the University community holds itself to a certain standard of conduct more stringent than those mandated by law."

86. The Faculty Handbook also references MSU's Relationship Violence & Sexual Misconduct Policy, which prohibits gender discrimination, including sexual assault, harassment, and violence.

### *History and Diagnosis of Poitra's Disability*

87. In 2015, prior to her employment at NAI, Dr. Poitra was involved in a serious car accident as an MSU hourly graduate student employee and fellow.

88. The accident occurred during a work outreach trip to a reservation school in the Upper Peninsula of Michigan.

89. At the time, Dr. Poitra was pursuing her doctorate degree at MSU and was employed by MSU.

90. Dr. Poitra and a team of other professionals from MSU were returning from a trip for tribal outreach to a Native school on the upper peninsula of Michigan.

91. Dr. Poitra was in a van with several other MSU colleagues when they were involved in a multi-car accident.

92. Dr. Poitra was in the van when it was hit by a semi-truck.

93. Dr. Poitra was seriously injured and underwent multiple surgeries as a result.

94. Dr. Poitra was diagnosed with a mild traumatic brain injury ("TBI") from the accident, and she suffered from serious cognitive symptoms, including memory loss.

95. As part of her recovery, Dr. Poitra received a significant amount of cognitive therapy, equivalent to that which a stroke victim would receive.

96. Following the accident, Dr. Poitra experienced vivid flashbacks of the accident, insomnia, and severe panic attacks.

97. Dr. Poitra was diagnosed with post-traumatic stress disorder ("PTSD").

98. As part of her PTSD diagnosis, Dr. Poitra underwent months of cognitive therapy and rehabilitation for the TBI through an MSU provider.

99. Dr. Poitra also went through the process of seeking worker's compensation through MSU.

100.     Through the worker's compensation application process, Dr. Poitra was required to provide substantial medical documentation to MSU and submitted to multiple medical examinations by providers who reported their findings about her injuries and diagnoses directly to MSU.

101.     When Dr. Poitra began work at NAI in October 2015, the disability accommodations she had been receiving through the Michigan State University Resource Center for Persons with Disabilities ("RCPD") as a graduate student were revised and extended to her as an employee.

102.     Per MSU policy, RCPD discussed Dr. Poitra's accommodations with Norder, as he was her supervisor.

103.     Norder and Dr. Poitra also met to discuss the accommodations in detail.

104.     During that conversation, Norder was not only made aware of Dr. Poitra's disabilities, but also the accident that led to the diagnosis.

105.     RCPD and MSU have strict rules in place to ensure confidentiality for employees and students registered with RCPD.

### *Harassment and Discrimination by Defendant John Norder*

106.     During Norder's tenure as director of NAI, Dr. Poitra was always his direct report and subordinate.

107.     However, from the beginning of Dr. Poitra's time at NAI, Norder entirely ignored professional boundaries and repeatedly harassed Poitra by making unwelcome sexual and other inappropriate comments, harassing her on the basis of her sex, her disability, and her weight.

108.     Norder purposely exploited his role as Dr. Poitra's supervisor to create an environment of pervasive abuse; abuse that significantly negatively affected Dr. Poitra's mental health.

109.     Throughout his time supervising Dr. Poitra, Norder engaged in a longstanding pattern of problematic and extremely distressing behavior.

110.     Specifically, Norder made repeated, unwanted sexual comments to Dr. Poitra. Norder's comments to Dr. Poitra were a common occurrence throughout his tenure, and included all the following:

   a.  Repeated comments and text messages to Dr. Poitra about his sexual "kinks" and "fetishes" and sexual activity with his wife, specifically telling Dr. Poitra about his sexual experiences, his interest in bondage, his open relationship, purchasing condoms, his "lack of sex" between him and his wife, and his sexual encounters with others;

   b.  Repeated inquiries asking Dr. Poitra about her sexual history, specifically asking Dr. Poitra about when she first had sex, how many sexual partners she had and implying she had "fetishes;"

c.  Comments and repeated text messages about bodily functions, including defecation, flatulence, incontinence, vomiting, and texting Dr. Poitra while he was in the bathroom describing these subjects;

d.  Stating that Dr. Poitra was "ugly" had "wrinkles" and negative and derogatory comments about her weight and size, such as asking if Dr. Poitra was over 300 pounds;

e.  Inappropriate suggestions via text message that a colleague was sexually interested in Dr. Poitra;

f.  Texting and sending photos to Dr. Poitra while he was in the shower;

g.  Inappropriate comments about what Dr. Poitra was wearing;

h.  Questioning Dr. Poitra's ability to manage her finances, implying that her husband had to manage her finances for her;

i.  Text messages about a "proud pecker" t-shirt Norder owned and said he would wear to show Dr. Poitra;

j.  Suggesting that Dr. Poitra had a sexually transmitted infection.

111.    These instances of harassment and workplace misconduct were not welcome to Dr. Poitra.

112.    Dr. Poitra repeatedly tried to disengage from inappropriate conversations by meeting Norder's comments with silence or telling him that she did not want to talk about the subject.

113.    However, Dr. Poitra's position as Norder's direct report made it nearly impossible for her to change the tenor of their conversations.

114.     As her supervisor, Norder wielded a great amount of power over Dr. Poitra, and Dr. Poitra was deeply concerned about losing her job if she did not acquiesce to Norder's inappropriate questioning and comments.

115.     On several occasions, Dr. Poitra even discussed this fear when speaking to her other colleagues.

116.     In addition to Norder's persistent sexual harassment, Norder also routinely harassed and discriminated against Dr. Poitra on the basis of her disability, namely her PTSD diagnosis.

117.     Norder was aware of Dr. Poitra's PTSD diagnosis.

118.     Additionally, Norder knew Dr. Poitra's PTSD diagnosis was the result of a near-fatal car accident, and that Dr. Poitra had difficulty traveling because of her PTSD.

119.     Despite this knowledge, Norder repeatedly engaged in intentional conduct meant to trigger Dr. Poitra's PTSD and cause her stress and anxiety.

120.     Approximately six months into working together, Norder and Dr. Poitra travelled together to a professional event that required several hours of driving.

121.     During that trip, Norder intentionally drove recklessly, looked at his phone while driving, and swerved into other lanes on the highway while Dr. Poitra was in the passenger seat.

122.     On another occasion when Norder drove Dr. Poitra to a professional event, he again intentionally drove recklessly.

123.     On this occasion, Dr. Poitra desperately pleaded with him to stop swerving on the highway.

124.     Norder laughed at Dr. Poitra and ignored her request.

125.     On another occasion, as Dr. Poitra was travelling to Alaska for work without Norder, Norder texted her a news story about a plane crashing, intending to bring her distress and trigger her PTSD.

126.     While traveling to other professional events, Norder texted Dr. Poitra links to stories about boats sinking and cars crashing.

127.     In addition to Norder's actions meant to trigger Dr. Poitra's PTSD, Norder also shared Dr. Poitra's diagnosis without her consent and in violation of university confidentiality rules.

128.     Over the course of Dr. Poitra's employment, Norder revealed Dr. Poitra's PTSD diagnosis to several colleagues, calling her "damaged."

129.     Norder told these colleagues that Dr. Poitra needed medication to travel, specifically Xanax, and often told others she had a drug problem.

130.     While Dr. Poitra and Norder worked in the same office, Norder routinely would sneak up behind Dr. Poitra.

131.     Dr. Poitra wouldn't know Norder was behind her until she saw his face on her computer screen.

132.     Due to her PTSD diagnosis, Dr. Poitra was extremely sensitive to surprises such as this.

133.     Dr. Poitra told Norder that he was scaring her and that she did not like this behavior.

134.     Dr. Poitra explicitly told Norder that he should not sneak up on her because of the negative impact it had on her, but Norder entirely ignored Dr. Poitra's request and continued the unwanted behavior.

135.     Throughout her time working for Norder, Dr. Poitra became increasingly concerned that Norder had cameras or microphones in the office to spy on his colleagues.

136.     Norder had previously shared with Dr. Poitra that he enjoyed voyeurism, and even texted Dr. Poitra about watching a live stream video of his wife attending a fitness class at MSU's pool without his wife's knowledge.

137.     Norder texted Dr. Poitra that he was "creepily watching" his wife and added, "[s]he's in the hot tub with a new friend. I'm practically in tears."

138.     Norder later encouraged Dr. Poitra to attend the same fitness class, so that he could watch them both.

139.     Norder even went so far as to set up remote access to his office computer, including the ability to control his office computer from his home.

140.     In February 2019, Norder used this remote access to the computer when another NAI employee was using his desk for the day.

141.     When Dr. Poitra asked Norder about it, he did not respond.

142.     Norder's countless inappropriate interactions with Dr. Poitra not only made her extremely uncomfortable, but also caused Poitra great distress and anxiety.

143.     Dr. Poitra dreaded going to work with Norder and tried to widen her professional network to try and secure a job elsewhere.

144.     Due to the unique nature of their work at NAI, this was incredibly difficult for Dr. Poitra.

145.     During her time working under Norder, Dr. Poitra applied for 34 jobs, just to try and get away from Norder.

### *Office of Institutional Equity Investigation*

146.     On August 9, 2018, MSU's Office of Institution Equity ("OIE") received a third-party report that Dr. Poitra was subjected to several violations of school policy, including, but not limited to sexual misconduct and discrimination based on her disability.

147.     Several days later, Dr. Poitra spoke with OIE and reported that between 2016 and 2018 she had been repeatedly harassed by Norder.

148.     Based on these reports, OIE opened an investigation into Norder's conduct.

149.     Upon information and belief, the applicable Title IX policy in place at the time Dr. Poitra filed her OIE complaint was the April 2018 RVSM Policy.[3]

150.     MSU implemented several different RVSM policies between the time Dr. Poitra first filed her complaint with MSU and the date her complaint was finally resolved.

151.     Upon information and belief, MSU's practice at the time of the events detailed in this complaint was to follow the RVSM policy that was in place at the time the complaint was filed.

152.     The April 2018 RVSM Policy reads, in relevant part:

> The University will use its best efforts to complete its investigations of relationship violence, stalking, or sexual misconduct within 60 calendar days, although this timeframe may be extended for good cause. The University will make its best efforts to complete the major steps of the investigation process within the following timeframes, although these timeframes may be modified or extended for good cause:

| INVESTIGATION STEP | TIMEFRAME |
|---|---|
| Contact claimant | Within 5 calendar days after receipt of report |
| Contact respondent | Within 5 calendar days after meeting with claimant |
| Provide preliminary report to parties | Within 25 calendar days after completing all relevant interviews and gathering all relevant |

---

[3] A copy of this policy is on file with Plaintiff's counsel.

| | evidence |
|---|---|
| Issue final report | Within 25 calendar days after receiving feedback from parties or completion of any additional investigation |

Good cause for the extension of an investigation timeline may exist for a variety of factors, including the complexity of the circumstances of each allegation, the integrity and completeness of the investigation, to comply with a request by law enforcement, to accommodate the availability of witnesses, to account for University breaks or vacations, or to address other legitimate investigatory reasons.

The University will maintain regular communication with the claimant and respondent about the progress of the investigation and its resolution. In the event the 60 day time frame is extended, both the claimant and the respondent will be notified of the delay and the reasons for the delay.

April 2018 RVSM Policy, pp. 38-39.

153.    The following RVSM Policy that was implemented, the February 2019 RVSM

Policy, reads in relevant part:

Parties can expect investigations to be completed within 60 days after OIE begins an investigation unless good cause exists to extend. In cases where a hearing is not held, parties can expect to receive a written decision within 90 days after OIE begins an investigation unless good cause exists to extend. In cases where a hearing is held, parties can expect to receive a written decision within 120 days after OIE begins an investigation unless good cause exists to extend. Good cause for extension may exist for a variety of factors, including the complexity of the circumstances of each allegation, the integrity and completeness of the investigation, to comply with a request by law enforcement, to accommodate the availability of witnesses, to account for University breaks or vacations, or to address other legitimate investigatory issues.

February 2019 RVSM Policy, Appendix G, p. 2.[4]

154.    On August 17, 2018, in response to OIE opening an investigation, Quentin Tyler,

at the time the Associate Dean Director for Diversity, Equity, and Inclusion, emailed

Norder to notify him he would need to work from home or from the MSU Museum.

---

[4] A copy of this policy is on file with Plaintiff's counsel.

155.     Norder was further notified that he was not to enter the NAI offices and was not to have any contact with any NAI staff members during the investigation.

156.     During this time, Dr. Poitra was directed to report to Tyler rather than Norder.

157.     Upon information and belief, later that afternoon, Norder called Tyler and attempted to find out who had filed the report with OIE.

158.     Upon information and belief, Tyler told him that he could not provide any additional information, but that OIE would be in touch during the investigation.

159.     Upon information and belief, Tyler later received a message from Norder.

160.     Upon information and belief, Norder told Tyler that he knew the complaint came from Dr. Poitra.

161.     After learning about the investigation and being directed to have no contact, Norder ignored the requirement and contacted Dr. Poitra by email, phone call, and text message.

162.     Norder even appeared in person at Dr. Poitra's office.

163.     In his texts to Dr. Poitra, Norder specifically referenced the email he received earlier that day from Tyler telling Norder not to contact anyone at NAI.

164.     Tyler allowed Norder to go into the office unsupervised during non-business hours, knowing Dr. Poitra had concerns about him placing secret recording equipment in the office, thus allowing Norder to abuse Dr. Poitra further.

165.     Tyler gave Norder permission to go into the NAI office the weekend of August 18 and 19, 2018 to retrieve any personal belongings.

166.     When Dr. Poitra returned to the office the following Monday, she found that tables, desks, chairs, and trash cans throughout the NAI offices had been moved by Norder.

167.     Poitra informed Tyler of Norder's actions and requested assistance putting the office back together but did not receive any assistance in moving any of the large furniture back to where it belonged.

168.     Dr. Poitra alone was made to fix all the damage Norder had caused.

169.     Upon information and belief, in a face-to-face meeting on August 20, 2018, Tyler again reminded Norder to not contact anyone in NAI.

170.     On August 21, 2018, Tyler sent Norder another email telling him not to contact anyone at NAI via text, email, or any other form of communication.

171.     On September 24, 2018, MSU placed Norder on paid administrative leave.

172.     Upon information and belief, Norder was informed that all work he was doing for NAI would be put on hold and he was not to enter the NAI offices without prior approval from Tyler.

173.     Despite no longer working with NAI, Norder continued to insist he needed to attend NAI-related conferences, events at which he knew Dr. Poitra would be in attendance.

174.     On November 6, 2019, Norder again violated the no contact directive and tagged Dr. Poitra in an article posted online.

175.     The next day, because Dr. Poitra no longer trusted MSU to protect her from Norder, she filed a petition for a Personal Protection Order ("PPO") in the 30th Judicial Circuit Court in Ingham County, Michigan.

176.     After an *ex parte* hearing on November 7, 2019, the court issued an order prohibiting Norder from contacting Dr. Poitra in any way.

177.     Norder, through his attorney, filed a motion to terminate the PPO.

178.     After a hearing, Norder's motion to terminate the PPO was denied.

179.    The PPO has since been extended multiple times and remains in effect at the time of this filing.

180.    On January 2, 2019, MSU's Office of Institutional Equity issued an initial preliminary investigative report written by an external investigator, Joshua Nolan of INCompliance Consulting.

181.    The report detailed Dr. Poitra's allegations against Norder and included witness interviews, and numerous exhibits such as text messages, emails, and pictures.

182.    The preliminary report was not complete and was missing some of the documentation Dr. Poitra had submitted to Nolan and OIE and interviews with some of the witnesses she had named.

183.    During the investigation, MSU conducted a search of Norder's MSU issued computer and found a large cache of pornographic videos and images.[5]

184.    Upon information and belief, some of these videos and images included Norder himself.

185.    In spring 2019, after learning about the pornographic material on Norder's computer, N. Suzanne Lang, Associate Dean for Faculty and Administrative Affairs, and MSU police officers came to NAI's office to search Norder's former office for filming equipment.

186.    Lang was concerned that the images of Norder might have been made at NAI offices.

---

[5] *See* Exhibit 1.

187.     After Lang's search and learning about the vast amount of pornography on Norder's MSU laptop—which included videos of Norder and his wife— Dr. Poitra no longer felt comfortable sitting at her abuser's former desk.

188.     Dr. Poitra approached Tyler about changing out the desk.

189.     Tyler refused to help and told Dr. Poitra she would have to figure out a solution on her own.

190.     Dr. Poitra eventually found a home for the desk in a different department; however, the desk still had many of Norder's belongings in it.

191.     Prior to moving the desk, Dr. Poitra informed Tyler that some of Norder's property was still in the desk.

192.     Tyler told Dr. Poitra to box up Norder's personal belongings.

193.     Tyler provided no other instructions or offers of assistance.

194.     When Dr. Poitra was forced to clean out the desk of her long-time abuser, she found tubes of anal lubes, creams, and ointments, causing her additional trauma.

195.     As these events unfolded, Dr. Poitra's OIE complaint continued to sit dormant, even though the preliminary investigative report had been completed in January 2019.

196.     On July 8, 2019, Dr. Poitra received an email from OIE informing her that her complaint was eligible for a hearing.

197.     No information was provided as to why the case had not moved forward during that time.

198.     More than a month later, on August 20, 2019, Dr. Poitra received another email notifying her that a prehearing would be held on September 9, 2019.

199.     For unknown reasons, on September 6, 2019, Katie Bylenga, the assigned hearing officer, notified Dr. Poitra that Bylenga had to recuse herself from the hearing due to something she had read in the investigative file.

200.     The matter was then assigned to an external contract hearing officer, Megan Norris.

201.     Dr. Poitra was never provided an explanation as to why Bylenga was forced to recuse herself, or why the conflict was not addressed in the more than eight months since the preliminary report was produced, or even in the two months since the matter had been assigned to the hearing office.

202.     On January 20, 2020, more than a year after the initial preliminary investigative report was issued, MSU's Office for Civil Rights and Title IX Education and Compliance facilitated a hearing.

203.     Dr. Poitra was not given any indication as to how long it would take to receive a decision after the hearing.

204.     On February 14, 2020, Dr. Poitra had still not received a decision.

205.     On that date, through her attorney, Dr. Poitra made a statement at MSU's Board of Trustees meeting.

206.     Dr. Poitra's attorney described the investigative report's findings, noting the pornographic images that were found on Norder's MSU issued computer, and asked the Board of Trustees to help her with getting the OIE investigation resolved.

207.     Dr. Poitra's case had been open for 544 days without a resolution at that point.

208.     Dr. Poitra's attorney also notified the Board of Trustees that Dr. Poitra had had to obtain a PPO to protect herself as Norder had continued harassing and stalking her throughout the course of the OIE investigation.

209.     On February 17, 2020, three days after Dr. Poitra's statement to the Board of Trustees, Norris issued a finding that Norder had violated MSU's Relationship Violence and Sexual Misconduct ("RVSM") Policy.

210.     Confusingly, despite finding that Norder had made multiple inappropriate comments about Dr. Poitra's weight and disability, Norris found that Norder had not violated MSU's Anti-Discrimination Policy.

211.     At that time, Dr. Poitra was not notified how Norder would be disciplined as to the RVSM Policy violations.

212.     On the date Norris' decision was issued, Dr. Poitra's case had been open for 547 days without a resolution, well beyond the timelines outlined in the relevant RVSM Policies, which provided timelines of between 60 and 120 days for the resolution of complaints.

213.     At no time was Dr. Poitra provided with notice as to what good cause could possibly exist for her complaint to be open for 427 days beyond the longest possibly applicable timeline.

214.     On April 22, 2020, more than two months after Norris' finding was issued, MSU notified Dr. Poitra that minimal disciplinary actions would be taken against Norder.[6]

215.     Norder was suspended without pay for four weeks.

216.     Norder's suspension was to be served in two week increments in May and August, designed specifically so that it would not interfere with any of his ongoing work, and even had a caveat to allow him to attend a previously scheduled event during one of the weeks.

217.     Norder became ineligible to hold an administrative position at MSU for five years.

---

[6] *See* Exhibit 2.

218.     Norder was ordered to have no contact with Dr. Poitra and was required to attend a

training offered by MSU regarding their Relationship Violence and Sexual Misconduct

Policy.

219.     Further, the letter referenced Norder's one and a half years of paid leave during the

investigation as "discipline."

220.     MSU took no other action against Norder despite his years of terrorizing Dr. Poitra.

221.     Norder continues to be employed by MSU as an Associate Professor of

Anthropology and teaches undergraduate classes and is still an active member of MSU's

campus community as of the date of filing.

### *Unequal Pay, Resources, and Access at NAI*

222.     More than one year after Norder was removed from his position as director of NAI,

Dr. Poitra was formally appointed Interim Director in September 2019.

223.     In the time between Norder's removal in 2018 and Dr. Poitra's formal appointment

as Interim Director, no one else was interviewed or appointed to the role.

224.     MSU made no attempt during that time to fill the vacancy, making Dr. Poitra the

*de facto* director during that time.

225.     Dr. Poitra completed not only her own obligations as Assistant Director, but also

took on all the responsibilities of the Director position without the title and without any

increase in pay for an entire year.

226.     Despite the so-called "promotion" to Interim Director in 2019, Dr. Poitra did not

receive a new contract or any pay increase for the added responsibilities until six months

later.

227.    Although Dr. Poitra was told at the time of her appointment that she would receive a pay increase, Dr. Poitra had to follow up with her superiors countless times before her concerns were addressed.

228.    When Dr. Poitra finally did receive a new contract, she found that she was being paid approximately $30,000 less than the previous director, Norder.

229.    Additionally, Norder had been given a start-up fund of approximately $20,000.

230.    Dr. Poitra did not receive any money for a start-up fund.

231.    Dr. Poitra was surprised and distressed by the inequitable offer, considering she was objectively more qualified than her male predecessor.

232.    At the time of Norder's appointment to Director of NAI, he had no experience working directly with Native communities and had a far shorter *curriculum vitae* than Dr. Poitra.

233.    When Dr. Poitra asked Lang about the stark differences between her contract and her predecessor's, she was told there was no room to negotiate.

234.    Given no other options, Dr. Poitra felt she had to accept the unfair offer, so she signed the contract on February 28, 2019.

235.    The contract included language stating that Hendrick, the Dean of CANR, intended to initiate a search for a permanent director within the next six to eight months.

236.    The contract encouraged Dr. Poitra to apply when the position opened.

237.    Nearly three years have passed since Dr. Poitra signed the contract, and no such search has ever occurred, nor has MSU made any attempt to undertake such a search.

238.    Since 1982, when NAI was first formed, all prior directors have had additional staff to assist them in carrying out the mission of NAI.

239.     All previous directors have had two full time employees and one half-time administrative staff.

240.     All previous directors were male, and, upon information and belief, none had a disability.

241.     Upon information and belief, none of the former directors filed a complaint of discrimination against a superior at MSU.

242.     Since Dr. Poitra took over the role, she has only had access to one part-time administrative support staff.

243.     There have been no full-time staff members hired to assist Dr. Poitra.

244.     The one administrative member of her staff is assigned to work one quarter of what a full-time employee would work, meaning even the part-time staff member on Dr. Poitra's team is assigned to work fewer hours than what all previous directors have enjoyed.

245.     In 2019, as Dr. Poitra was effectively doing the work of three full-time employees, she approached Tyler to discuss hiring additional staff to assist her.

246.     Tyler spoke with Hendrick, who decided he preferred to wait until the OIE investigation was completed before hiring additional staff.

247.     In total, the OIE investigation took 547 days to resolve.

248.     It was through no fault of Dr. Poitra that the investigation took so long.

249.     In fiscal years 2019 and 2020, NAI's budget was significantly reduced.

250.     This reduction ensured that Dr. Poitra would be unable to hire any staff in the near future.

251.     From her appointment in 2019 to March 2020, Dr. Poitra was also excluded from a weekly Chairs and Directors meeting that all other unit leaders were invited to attend.

252.    Dr. Poitra's male predecessors were not excluded from these meetings.

253.    In March 2020, when the MSU campus went remote due to the Covid-19 pandemic, Dr. Poitra approached Tyler to ask why she was being excluded from the meetings, which prevented her from receiving critical information about sudden policy shifts due to the pandemic.

254.    Tyler told Dr. Poitra he would speak with Hendrick about her request and get back to her.

255.    In April 2020, Dr. Poitra was finally included in these meetings.

256.    In early 2020, Dr. Poitra again approached Tyler about the severe staff shortage in NAI.

257.    Dr. Poitra was still shouldering the work of more than three employees, plus the new responsibilities related to all the added grant-related work.

258.    Dr. Poitra asked for additional funding to hire just one full-time specialist, even though her male predecessors had at least two full-time specialists.

259.    Dr. Poitra's request was denied without explanation.

260.    Tyler told Dr. Poitra he wondered if NAI even belonged within the College of Agriculture.

261.    It was clear to Dr. Poitra at this point that if she continued to ask for the support her department needed, NAI would likely be moved to a different, less prestigious department within MSU, and Dr. Poitra would be removed as director since she was still labeled as "interim."

262.    Despite being set up by MSU to fail in her position as Interim Director, Dr. Poitra continued to do impactful work with NAI.

263.     During her first two years as Interim Director, Dr. Poitra brought in over a million dollars through federal grants, published several articles, received awards, put on an array of programming, developed new relationships with Indigenous communities, and elevated the image of NAI across MSU's campus and nationally.

264.     Hendrick even went so far as to praise NAI's work in his speech at the Spring 2021 commencement ceremony.

265.     In May 2021, after almost two years of being interim director of NAI, Dr. Poitra met with Tyler to discuss her desire to be appointed as full director.

266.     Dr. Poitra noted all the many accomplishments she had achieved, even without the assistance of any employees.

267.     Following a conversation with Hendrick, Tyler told Dr. Poitra that they would not change her title without first doing a national search to fill the position.

268.     Norder, the previous director of NAI was appointed without a national search and had far less experience than Dr. Poitra at his time of hiring.

269.     Further, at this point, Tyler had begun a new position as Director of MSU Extension a mere three weeks earlier.

270.     The Director of MSU Extension oversees numerous offices around the state and is a huge arm of the university.

271.     Tyler had been appointed to his new post without a national search.

272.     To appoint someone as Director of MSU Extension without experience directing it, or something like it, and without a national search, was unprecedented.

273.     At this time, Tyler also told Dr. Poitra that she had not done enough to earn the title of Director.

274.    During this same meeting, Tyler again warned Dr. Poitra that NAI did not fit into CANR, and told her that once her contract was up, her unit might be restructured.

275.    Dr. Poitra understood this to be a threat that if she continued to ask for equitable treatment, the future of her unit would be in serious jeopardy.

276.    Should NAI be moved to MSU Extension as was threatened by Dr. Poitra's superiors, its mission would be reworked and greatly constrained.

277.    While CANR is an academic unit, focused on research, writing, and outreach, MSU Extension focuses solely on outreach.

278.    If NAI were moved to MSU Extension, Dr. Poitra would not be allowed to continue many of the scholarly activities that she has spent years working on.

279.    Further, Dr. Poitra's reporting line would be changed, and NAI would have far less connection to the academic side of MSU.

280.    Overall, if NAI were to be moved to MSU Extension, the department would have both far less academic prestige and less scope.

281.    On June 9, 2021, Emily Sorroche, an MSU employee working as a direct report to Tyler, contacted Dr. Poitra and told her that CANR would be pulling their support from all NAI projects unless Dr. Poitra could hire someone to assist her.

282.    Dr. Poitra was baffled by the sudden change in staffing requirements, after she had been pushing for support for years, and asked for an explanation.

283.    MSU never provided Dr. Poitra with any explanation.

284.    On June 10, 2021, Dr. Poitra learned that MSU had appointed a spousal hire to work at NAI, Teresa Tongbin.

285.    Tongbin's degrees and expertise are in transportation engineering.

286.     Tongbin is not an expert in Native studies, has no prior experience working with Native people or tribes, has not written or produced any research on the subject, and is not Native herself.

287.     Despite Tongbin's lack of experience in relation to the work at NAI, Tyler told Dr. Poitra that Tongbin was being hired to NAI, and requested Dr. Poitra give Tongbin a title, such as Assistant Director or Associate Director.

288.     On June 11, 2021, Dr. Poitra received a copy of Tongbin's offer letter.[7]

289.     Tongbin's offer included a salary several thousand dollars more than Dr. Poitra, even though Tongbin had no relevant experience and would be directly reporting to Dr. Poitra.

290.     Dr. Poitra addressed these concerns via email to Tyler, but nothing was done to rectify the situation.

291.     Instead, Tyler abruptly reversed his decision, and placed Tongbin in a different department.

292.     Instead of addressing Dr. Poitra's valid concerns and paying her an equitable and competitive salary, MSU deliberately chose to remove an employee from NAI.

293.     Later, both Millenbah and Tyler separately told Dr. Poitra that Tongbin was moved from her previous department to NAI because Tongbin had made a sexual harassment complaint.

294.     Tongbin's previous role was far more aligned with her education and experience, but rather than removing her harasser from the department, MSU elected to send Tongbin to a different department in which she had no experience.

---

[7] *See* Exhibit 3.

295.    In August 2021, MSU moved an Administrative Assistant from a different department to NAI.

296.    The Administrative Assistant hired for NAI is not Native and has no experience working with Native communities.

297.    Millenbah told Dr. Poitra that the Administrative Assistant was a problem as she had filed a complaint with her union related to a prior position at MSU.

298.    The Administrative Assistant reports directly to Dr. Poitra.

299.    However, despite being her supervisor, Dr. Poitra's salary is approximately $7,000 per year less than the Administrative Assistant's.

300.    Again, Dr. Poitra attempted to address the pay inequity with her supervisors, but nothing was done.

### *Harassment, Abuse, and Retaliation by Other Supervisors*

301.    In July 2021, Dr. Poitra learned she had also been excluded from college-level research meetings that all others in similar roles to Dr. Poitra had been attending throughout the pandemic.

302.    During this time, Dr. Poitra also learned for the first time that MSU allowed for early release before university holidays, which allows for faculty and academic staff like Dr. Poitra to take extra time before holidays without dipping into their allotted vacation time.

303.    Tyler had never informed Dr. Poitra about this, despite informing other offices and subordinates.

304.    As a result, Dr. Poitra had been using vacation time when others in similar positions at MSU were taking time off without using vacation time.

305.     In July 2021, Dr. Poitra spoke with Kelly Millenbah, the Interim Dean of CANR, about her concerns.

306.     By this time, Hendrick had left CANR, and Millenbah had been appointed Interim Dean to take over his duties.

307.     Poitra asked Millenbah if she could report directly to her, rather than to Tyler.

308.     On July 14, 2021, Dr. Poitra received a letter instructing her to stop reporting to Tyler, and to instead report to Scott Loveridge, the Assistant Dean for Faculty Affairs and Development.

309.     Rather than citing Dr. Poitra's distrust in Tyler and the years of gaslighting Tyler engaged in, the letter simply stated Tyler had too much on his plate and reporting lines needed to be redistributed as a result.

310.     Changing Dr. Poitra's reporting line to Loveridge was not a typical change within MSU.

311.     While Dr. Poitra was initially pleased to be reporting to Loveridge rather than Tyler, that sentiment quickly faded.

312.     Almost immediately after becoming Dr. Poitra's supervisor, Loveridge used several racial epithets in his conversations and emails with Dr. Poitra.

313.     When Dr. Poitra approached Millenbah to discuss Loveridge's overt and harmful racist comments, Millenbah told Dr. Poitra to speak with Loveridge directly.

314.     Millenbah admitted that Loveridge used racial epithets but did nothing to address his behavior.

315.     In August 2021, a representative from a Native group working with NAI contacted Dr. Poitra about a project that was nearing its completion.

316.     Through this conversation, Dr. Poitra learned that Norder undertook this project prior to his removal from NAI in 2018 and took the grant money associated with the project but did not complete any of the work.

317.     Dr. Poitra reached out to her supervisors to address the situation, but was instructed to apologize on behalf of Norder, her longtime abuser, and try to recover the relationships that Norder destroyed.

318.     Dr. Poitra has tried again and again to address the inequitable and discriminatory treatment she has received while leading NAI.

319.     However, all her concerns have been met with inaction.

320.     In late August 2021, Dr. Poitra had a meeting with MSU's Provost, Teresa Woodruff.

321.     On August 27, 2021, shortly after that meeting, Dr. Poitra received notification that NAI would be moving out of CANR and under the Provost's office instead, specifically into the Office of University Outreach and Engagement.

322.     Dr. Poitra was informed her new supervisor would be Laurie Van Egeren, the Interim Associate Provost for University Outreach and Engagement.

323.     With NAI's new placement within MSU, Dr. Poitra again tried to address her concerns about her unequal pay with her new supervisors.

324.     On August 28, 2021, Dr. Poitra sent an email to Woodruff and Van Egeren outlining her concerns.

325.     On September 28, 2021, Dr. Poitra had a meeting with Van Egeren to discuss this matter.

326.     Van Egeren stated that she could only offer Poitra $10,000 more per year, and that perhaps a year later MSU would offer an additional $10,000.

327.     MSU released salary information for all its employees in 2021.[8]

328.     In 2021, there were 44 employees with the rank of Institute Director or Institute/Center Director.

329.     The average salary at this role was over $172,000 in 2021.

330.     Dr. Poitra was by far the lowest paid person at MSU in this role, making only $80,784.

331.     For every dollar the average employee of this rank made, Dr. Poitra made 47 cents.

332.     The next lowest paid employee at this rank above Dr. Poitra made $100,548.

333.     Out of all the Institute and Institute/Center Directors at MSU, Dr. Poitra was the only one making less than $100,000.

334.     Dr. Poitra was not only the lowest paid employee in this role across MSU, but she was the lowest paid by $20,000 per year.

335.     Even if MSU paid Dr. Poitra $10,000 more per year, as offered in her meeting with Van Egeren, she would still have been paid significantly less than every other employee of her rank throughout the entire university.

336.     On October 18, 2021, Dr. Poitra participated in a meeting led by MSU's Chief Diversity Officer, Dr. Jabbar Bennett.

337.     Dr. Poitra asked Bennett what systems were in place to address pay inequity within MSU.

---

[8] *FY21 Faculty and Staff Salary Listing*, Michigan State University, https://msu.edu/-/media/assets/msu/docs/state-transparency/sec245fy21salarylist.pdf.

338.     Bennett stated that while there are systems in place, he could not say what they were, or that they went "beyond spreadsheets."

339.     Bennett went on to admit that a different system is needed across the board.

340.     On November 8, 2021, Dr. Poitra received a new offer letter from MSU.

341.     While the new offer letter raised her salary to $105,000, this would have only raised Dr. Poitra to second-lowest paid Institute or Institute/Center Director at MSU, with her salary still well below the average of $172,000 across the university.

342.     The letter also stated that MSU would remove Dr. Poitra's experienced administrator from NAI and force her to do a search for a less qualified administrator who would be paid approximately half of what the current administrator was paid.

343.     This stipulation would have added even work to Dr. Poitra's plate and limited her ability to do her work further.

### *Decline in Health*

344.     Despite the inequitable way MSU had treated Dr. Poitra throughout her employment, Dr. Poitra continued to work diligently at her role at NAI until November 2021.

345.     In November 2021, the emotional and psychological toll of the years of abuse at MSU finally caught up with Dr. Poitra, and she applied and was approved for Family Medical Leave Act ("FMLA").

346.     Prior to taking FMLA leave, Dr. Poitra's doctor had diagnosed her with PTSD due to work stress, which was manifesting in numerous increasingly serious symptoms including weight loss, joint pain, digestive symptoms, muscle tension, jaw pain, sleep disturbances, nightmares, anxiety, hypervigilance, and menstrual irregularity.

347.     At the time of filing, Dr. Poitra remains on FMLA leave.

### *Pervasive Culture of Sexual Harassment and Misconduct at MSU*

348.     Dr. Poitra's story is far from unique at MSU.

349.     There are numerous instances of faculty and engaging in sexual harassment with few to no consequences.

350.     Over the years, MSU has created a culture of permissible sexual misconduct through ignoring cases of abuse and refusing to adequately respond to cases that do get reported.

351.     Most notably, MSU spent years ignoring sexual assault complaints against Larry Nassar.

352.     Nassar, who is now serving a decades-long prison sentence for his crimes, sexually assaulted over 200 women during his time at MSU.

353.     After an investigation by the U.S. Department of Education, MSU was fined $4.5 million for failing to adequately address reports of sexual abuse and failing to prevent further abuse from occurring.

354.     This fine does not include the $500 million settlement into which MSU entered to settle a lawsuit brought by victims of Nassar's abuse.

355.     Since 2015, news reports indicate that at least 49 faculty and staff at MSU have been found in violation of MSU's Relationship Violence and Sexual Misconduct policy, with several of those remaining either employed or affiliated with MSU.[9]

---

[9] Kara Berg, *Despite warnings, multiple reports of sexual misconduct, faculty remain employed at MSU*, Lansing State Journal, Jan. 28, 2021, https://www.lansingstatejournal.com/story/news/2021/01/28/michigan-state-university-msu-faculty-sexual-harassment-assault/4249555001/.

356.    At least four faculty members remain employed at MSU even after multiple findings of sexual misconduct.

357.    William Donahue, a Professor of Veterinary Medicine, was found responsible for sexual misconduct three times during his tenure at MSU.

358.    Donahue not only remains employed at MSU, but was appointed the faculty grievance officer in 2014, just months after making inappropriate sexual jokes at a university dinner that required an apology letter from the department chair.

359.    Donahue held that position until 2018.

360.    Robert Wiseman, a Physiology Professor, was found to have harassed six students over nearly two decades.

361.    At least nine women made allegations of harassment against Wiseman.

362.    Despite an OIE finding that Wiseman violated the RVSM policy, Wiseman remains employed as a professor at MSU.

363.    In May 2021, two former MSU professors were stripped of their *emeritus* status years after they were found to have committed sexual assault.

364.    Charles Steinfeld, a former professor in the Department of Media and Information, was found in 2012 to have inappropriately touched three women.

365.    It took nine years for MSU to remove his *emeritus* status.

366.    Thomas Vogel, a professor in the Department of Environmental and Earth Sciences, sexually assaulted a woman in 2010 at an MSU event.

367.    The assault was reported to OIE in 2016.

368.    Vogel remained a professor *emeritus* for nearly five years after OIE found the complaint to have merit.

369.    Most recently, in June 2021, David Foran, a Criminal Justice Professor at MSU resigned before the Board of Trustees could fire him after an OIE investigation found he sexually harassed at least four women and retaliated against at least one of the women for participating in the investigation.

370.    OIE first received complaints of Foran's behavior starting in in 2016.

371.    OIE even spoke with Foran about his behavior in 2016 but did nothing further to prevent any future abuse or protect any of his victims.

372.    As recently as January 15, 2021, MSU President Samuel L. Stanley, Jr. acknowledged in a university-wide email that MSU still has work to do in addressing similar claims.[10]

373.    Stanley also acknowledged that MSU "failed survivors and our community."[11]

374.    However, Stanley's statement to MSU does little to rectify the years of abuse that Poitra and countless others at MSU were forced to experience.

375.    MSU has spent years creating and nurturing a culture that has allowed men in positions of power to prey on, assault, and harass younger women.

376.    This problem isn't limited to one department, or one program, but rather is pervasive in that it reaches all corners of MSU.

377.    Despite her diligent work in her role at MSU, and her deep desire to connect, educate, and inspire, Dr. Poitra has been the subject of years of harassment, discrimination, and retaliation which has continued unabated during her entire employment tenure at MSU.

*__Timeliness of Complaint__*

---

[10] Samuel L. Stanley, Jr., *Eradicating RVSM remains key priority for MSU*, MSU Office of the President 2021 Community Letters (Jan. 15, 2021), https://president.msu.edu/communications/messages-statements/2021_community_letters/2021-01-15-rvsm-letter.html.
[11] *Id.*

378.     Dr. Poitra has exhausted her administrative remedies.  In October 2019, she timely filed a complaint alleging discrimination on the basis of sex and disability with the U.S. Department of Education, Office for Civil Rights.  In June 2020, she received notice that the U.S. Department of Education was transferring the matter to the U.S. Equal Employment Opportunity Commission ("EEOC").  In December 2021, the EEOC notified her that the U.S. Department of Justice ("DOJ") would be issuing a right to sue letter.  In January 2022, she received a right to sue letter from the DOJ.

379.     Dr. Poitra timely filed this action within 90 days of receipt of her right to sue letter.

### COUNT I
### Violation of Title IX
### Deliberate Indifference to Sex Discrimination
### 20 U.S.C. §§ 1681 *et seq*.
### (MSU and MSU Board of Trustees)

380.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

381.     From October 2015 to November 2019, Plaintiff was subjected to sex-based abuse and harassment committed by her male supervisor.

382.     From August 2018 to April 2020, Defendants engaged in repeated acts of deliberate indifference to Plaintiff's multiple reports of sex discrimination and retaliation perpetrated by Norder.

383.     Defendants failed to take immediate, effective remedial steps to resolve Plaintiff's complaints of sex discrimination and instead acted with deliberate indifference to Plaintiff's claims.

384.     Defendants' lack of action and failure to appropriately respond to Plaintiff's reports caused Plaintiff to experience further sexual harassment and retaliation by Norder.

385.     Defendants persisted in their actions and inaction despite having actual knowledge of the discrimination to which Plaintiff has been subjected.

386.     Defendants engaged in a pattern and practice of behavior designed to discourage and dissuade women who had experienced sex discrimination from seeking assistance and protection.

387.     This pattern and practice of behavior constitutes disparate treatment of women and has a disparate impact on women.

**COUNT II**
**Violation of Title IX**
**Creating a Heightened Risk**
**20 U.S.C. §§ 1681, *et seq*.**
**(MSU and MSU Board of Trustees)**

388.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

389.     Plaintiff Poitra alleges violations of Title IX against Defendants MSU and MSU Board of Trustees due to the heightened risk of sex-based discrimination on MSU's campus. Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

390.     Despite having a written Relationship Violence & Sexual Misconduct policy, MSU repeatedly failed to follow that policy and offered inadequate training to faculty on how to implement the policy correctly. While the policy claimed to provide an environment that "fosters the values of safety; mutual respect; dignity; equity; responsibility; and clear and timely communication", MSU did little to ensure that policy was realized, and instead created a heightened risk of sex-based discrimination and harassment.

391.     MSU has spent years creating and fostering an environment filled with sexual

harassment and abuse. Poitra is one of countless women who have undergone a lengthy

and traumatizing OIE investigation, only for their abuser to remain employed at MSU and

able to continue to abuse them.

**COUNT III**
**Title IX Retaliation**
**20 U.S.C. §§ 1681, *et seq*.**
**(MSU and the MSU Board of Trustees)**

392.     Plaintiff realleges and incorporates by reference the allegations contained in the

previous paragraphs.

393.     This action is brought pursuant to Title IX of the Educational Amendments of 1972,

20 U.S.C. §1681, *et seq*.

394.     Plaintiff engaged in Title IX protected activity by repeatedly reporting Norder's sex

discrimination and retaliation to her supervisors and to OIE.

395.     Plaintiff spent a year and a half waiting for a resolution after making her OIE report.

396.     During that time, Plaintiff, through her attorney, directly addressed the Board of

Trustees about the lack of action on the report and notified them directly of Norder's

continued harassment during the OIE investigation.

397.     Plaintiff's actions were protected from retaliation per the Supreme Court's holding

in *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167 (2005).

398.     Defendant Norder continued to stalk and harass Plaintiff after she made her report

to OIE in retaliation for making the report.

399.     These adverse actions would not have occurred but for Plaintiff's Title IX report.

400.     Multiple MSU administrators, including Tyler and OIE staff, were aware of Norder's retaliatory actions but acted with deliberate indifference toward Plaintiff's reports of continued harassment by Norder.

401.     MSU had knowledge of this retaliation and control over these employees.

**COUNT IV**
**First Amendment Retaliation**
**Freedom of Speech**
**42 U.S.C. § 1983**
**(MSU, MSU Board of Trustees, and Tyler)**

402.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

403.     The free speech provision of the First Amendment to the U.S. Constitution provides that "congress shall make no law … abridging the freedom of speech and of the press." U.S. Const., amend. I.

404.     The requirements of the First Amendment are applied to the states and state actors through the due process clause of the Fourteenth Amendment of the U.S. Constitution.

405.     Under 42 U.S.C. § 1983, Defendants may be held liable for their violation of the free speech rights of Plaintiff by taking adverse action against her in retaliation for her exercise of her First Amendment right to speak out on a matter of public concern.

406.     Plaintiff engaged in protected speech when she spoke out about her experience of being harassed and how her role and her department were treated inequitably after she reported this harassment.

407.     Plaintiff, though her attorney, engaged in protected speech when she addressed MSU's Board of Trustees about Norder's unethical and disturbing behavior and continued employment.

408.     Plaintiff's speech was a matter of deep public concern, particularly given that Norder continues, to this day, to be employed by MSU and teaches several classes that include vulnerable undergraduates.

409.     After speaking out against the years-long harassment and abuse Plaintiff endured at the hands of Norder, she was given more work but significantly lower pay than her predecessors, was repeatedly denied promotions and professional opportunities, her office's budget and staff were reduced, and her office's place at the university was threatened.

410.     Based on Defendant Tyler's statements, Plaintiff feared that if she complained about the treatment she received, NAI would be further diminished or even dismantled.

411.     Plaintiff's constitutionally protected activity was a substantial and motivating factor for Defendants' adverse actions. Thus, Defendants acted with a retaliatory intent and motive.

412.     Defendants' conduct would chill an ordinary person from exercising their First Amendment rights.

413.     Defendants acted intentionally and with callous disregard for the Plaintiff's clearly established constitutional rights.

## COUNT V
## Violation of Title VII
## Discrimination of the Basis of Sex
## 42 U.S. Code § 2000e-2 *et seq*.
## (MSU Board of Trustees)

414.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs

415.     Poitra is an employee within the meaning of Title VII.

416.    Plaintiff, a woman, is a member of a protected class.

417.    MSU is an employer within the meaning of Title VII.

418.    Plaintiff met, and many times exceeded, her employer's legitimate job performance expectations.

419.    Plaintiff suffered numerous adverse employment actions.

420.    By the acts and omissions alleged herein, Defendants discriminated against Plaintiff Poitra in violation of Title VII by, on the basis of sex:

    a.  Refusing to carry out a timely investigation and resolution to Poitra's sexual harassment complaint against Defendant Norder;

    b.  Proving no support to Poitra throughout the investigation process, and ignoring her requests for assistance;

    c.  Paying Poitra significantly less than her male predecessors;

    d.  Refusing to give Poitra the title of NAI Director without a national search, a requirement her male predecessors did not have to complete;

    e.  Failing to actually initiate a national search so that Poitra could compete for the role of NAI Director;

    f.  Excluding her from important staff meetings her male predecessors had had access to;

    g.  Requiring her to do the work of more than three employees and ignoring her repeated requests for the same, or even less, support than her male predecessors received.

**COUNT VI**
**Violation of Title VII**
**Retaliation**
**42 U.S.C. § 2000e-3(a)**
**(MSU and MSU Board of Trustees)**

421.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

422.     Plaintiff is an employee within the meaning of Title VII.

423.     MSU is an employer within the meaning of Title VII.

424.     Title VII prohibits employers from retaliating against employees that have made or assisted in claims:

> It shall be an unlawful employment practice for an employer to discriminate against an of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

> 42 U.S.C. § 2000e-3(a).

425.     Plaintiff has long been the subject of discrimination on the basis of sex, as defined by Title VII.

426.     Not only did Defendant Norder directly discriminate against and harass Plaintiff, but MSU and its agents have consistently treated Plaintiff differently because of her sex and race.

427.     Plaintiff is the only female and the only Latina-Native American to ever head NAI, and she has been treated unequally from the very beginning of her tenure.

428.     Plaintiff spent years advocating for equal treatment, but each time she did so her efforts were met with refusals, dismissals, and even threats to her employment by Defendants.

429.     Defendants have consistently retaliated against Plaintiff when she has advocated for equitable treatment under Title VII.

### COUNT VII
**Violation of Title I of the ADA
Disability Discrimination
42 U.S.C. § 12111 *et seq.*
(MSU and MSU Board of Trustees)**

430.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

431.     Plaintiff is a qualified individual with a disability within the meaning of the ADA because she actually and currently has, has a record of, or is regarded as having a physical or mental impairment that substantially limits one or more major life activities.

432.     MSU is a covered entity and an employer under the ADA.

433.     Defendants knew of Plaintiff's disability.

434.     Plaintiff was subjected to unwelcome harassment based on her disability by Defendant Norder.

435.     Defendant Norder's harassment of Plaintiff was sufficiently severe or pervasive to alter a term, condition, or privilege of her employment.

436.     Defendants knew of Plaintiff's complaints of disability discrimination and harassment by Defendant Norder.

437.     Defendants failed to take prompt, remedial action to end Defendant Norder's harassment of Plaintiff.

**COUNT VIII**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**Disability Discrimination**
**29 U.S.C. §§ 794 *et seq*.**
**(MSU Board of Trustees)**

438.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

439.     Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794 provides that:

> No otherwise qualified individual with a disability in the United States, as defined in Section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…

440.     Section 504 defines a "program or activity" to include all operations of a college, university, or other postsecondary institution or a public system of higher education.  29 U.S.C. § 794(b)(2)(A).

441.     MSU is a program or activity subject to the requirements of Section 504.

442.     Plaintiff is a qualified individual with a disability within the meaning of Section 504 because she actually and currently has, has a record of, or is regarded as having a physical or mental impairment that substantially limits one or more major life activities.

443.     Defendants knew of Plaintiff's disability.

444.     Plaintiff was subjected to unwelcome harassment based on her disability by Defendant Norder.

445.     Defendant Norder's harassment of Plaintiff was sufficiently severe or pervasive to alter a term, condition, or privilege of her employment.

446.     Defendants knew of Plaintiff's complaints of disability discrimination and harassment by Defendant Norder.

447.     Defendants failed to take prompt, remedial action to end Defendant Norder's harassment of Plaintiff.

**COUNT IX**
**Denial of Substantive and Procedural Due Process**
**42 U.S.C. § 1983, the Fifth Amendment,**
**and the Fourteenth Amendment**
**(Defendants Simon, Engler, Udpa, Stanley, Hendrick,**
**Kent, Jachimiak, Tyler, and Norder in their individual capacities)**

448.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

449.     Plaintiff alleges violations of 42 U.S.C. § 1983 against the above-named Defendants in their individual capacities due to deprivation of her property and liberty interests without adequate notice or a meaningful opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.

450.     All Defendants are state actors and at all relevant times were acting under color of law.

451.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . .." U.S. Const. amend. XIV, § 1.

452.     As MSU Presidents, Simon, Engler, Udpa, and Stanley were responsible for oversight of the university and ensuring that the university complied with its legal obligations.

453.     As Dean of the College of Natural Science, Hendrick was responsible for oversight of the College and ensuring that the College complied with its legal obligations.

454.    As Title IX Coordinators, Kent and Jachimiak were responsible for oversight of the Title IX policies, procedures, and systems throughout the university and ensuring that the university complied with its legal obligations.

455.    Defendants' failure to comply with the administrative requirements of Title IX and its own RVSM Policy deprived Plaintiff of her substantive due process rights to her liberty interest in bodily integrity and her property interest in her professional reputation and reasonable advancement in her career.

456.    Defendants' failure to comply with the administrative requirements of Title IX and its own RVSM Policy deprived Plaintiff of her procedural due process right to be heard prior to depriving her of her liberty and property interests.

457.    Defendants, in their individual capacities and under color of law, subjected Plaintiff to violations of her liberty and property interests by failing to comply with the procedures and timelines outlined in their own RVSM Policies, engaging in direct discrimination and harassment of Plaintiff, failing to timely investigate and respond to Defendant Norder's ongoing harassment of her, failing to ensure that the effects of Defendant Norder's discrimination against her were fully remedied, failing to respond appropriately to her reports of retaliation by Defendant Norder, failing to timely and investigate and respond to her report of Loveridge's harassment of her, and failing to adequately train and supervise their staff with respect to the handling of Title IX complaints.

458.    Plaintiff's right to due process under the law is one of which reasonable officials in Defendants' positions would have known, particularly given the events of the past six years, including the Larry Nassar investigation; the multiple U.S. Department of Education, Office for Civil Rights investigations MSU has gone through; the various external audits

MSU has had performed on its Title IX reporting and investigation processes; and recent cases against MSU such as *Mumphery v. MSU*[12] and *John Doe v. MSU*[13] which centered on the due process rights of parties in the Title IX investigation and case resolution processes.

459.     The actions of Defendants violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.[14]

**COUNT X**
**Denial of Equal Protection**
**42 U.S.C. § 1983 and the Fourteenth Amendment**
**(Defendants Simon, Engler, Udpa, Stanley, Hendrick,**
**Kent, Jachimiak, Tyler, and Norder in their individual capacities)**

460.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

461.     Plaintiff alleges violations of 42 U.S.C. § 1983 against the above-named Defendants in their individual capacities due to discrimination on the basis of sex that denied Plaintiffs equal protection under the law in violation of the Equal Protection Clause of the Fourteenth Amendment.

462.     Defendants are state actors and at all relevant times were acting under color of law

463.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

---

[12] No. 1:18-cv-576 (W.D. Mich. 2019).
[13] No. 1:18-cv-1430 (W.D. Mich. 2021).
[14] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

464.     As MSU Presidents, Simon, Engler, Udpa, and Stanley were responsible for oversight of the university and ensuring that the university complied with its legal obligations.

465.     As Dean of the College of Natural Science, Hendrick was responsible for oversight of the College and ensuring that the College complied with its legal obligations.

466.     As Title IX Coordinators, Kent and Jachimiak were responsible for oversight of the Title IX policies, procedures, and systems throughout the university and ensuring that the university complied with its legal obligations.

467.     Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to intermediate scrutiny.

468.     Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on race is presumptively unconstitutional and subject to strict scrutiny.

469.     Defendants' discrimination against Plaintiff on the basis of sex was not substantially or rationally related to any legitimate government interest.

470.     Defendants' discrimination against Plaintiff on the basis of race was not necessary to achieve a compelling state interest.

471.     Defendants, in their individual capacities and under color of law, subjected Plaintiff to violations of her liberty and property interests by failing to comply with the procedures and timelines outlined in their own RVSM Policies, engaging in direct discrimination and harassment of Plaintiff, failing to timely investigate and respond to Defendant Norder's ongoing harassment of her, failing to ensure that the effects of Defendant Norder's discrimination against her were fully remedied, failing to respond appropriately to her reports of retaliation by Defendant Norder, failing to timely and investigate and respond to

her report of Loveridge's harassment of her, and failing to adequately train and supervise their staff with respect to the handling of Title IX complaints.

472. Defendants' discrimination against Plaintiff on the basis of sex and race endangered her safety, privacy, security, and well-being.

473. Defendants' actions and inactions deprived Plaintiff of her right to equal dignity, liberty, and autonomy by treating her as a second-class citizen at MSU.

474. Plaintiff was denied the opportunity to take advantage of interim measures that could have assisted her in fully accessing her right to liberty after she had been the victim of sexual misconduct.

475. Plaintiff was denied MSU's protective services as a female, Native American victim of sex discrimination, two acknowledged disfavored minorities.

476. This selective treatment was related to the school's interest in covering up sexual misconduct and race discrimination; in other words, this selective treatment was not substantially or rationally related to any legitimate government interest.

477. This selective treatment caused Plaintiffs to have to go on FMLA leave to deal with the emotional damage the ongoing abuse caused her.

478. It is clearly established that failing to properly investigate allegations of sex and race discrimination violates the Equal Protection clause.

479. First, "a State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause."[15]

480. More recently, the Supreme Court heard a case in which petitioners filed suit against the local school district's governing board and superintendent, alleging that their

---

[15] *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989).

response to allegations of peer-on-peer sexual harassment of petitioners' daughter was inadequate and constituted unconstitutional sex discrimination in schools in violation of 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment.[16]

481.    The Supreme Court held that "Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights," and "§ 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools," including in the case of school officials' inadequate responses to allegation of peer-on-peer sexual harassment.[17]

482.    Plaintiff's right to equal protection under the law is one of which reasonable officials in Defendants' positions would have known, particularly given the events of the past six years, including the Larry Nassar investigation; the multiple U.S. Department of Education, Office for Civil Rights investigations MSU has gone through; the various external audits MSU has had performed on its Title IX reporting and investigation processes; and recent cases against MSU such as *Mumphery v. MSU*[18] and *John Doe v. MSU*[19] which centered on the due process rights of parties in the Title IX investigation and case resolution processes.

483.    The actions of Defendants violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.[20]

---

[16] *Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246, 250 (2009).
[17] *Id.* at 258.
[18] No. 1:18-cv-576 (W.D. Mich. 2019).
[19] No. 1:18-cv-1430 (W.D. Mich. 2021).
[20] *Pearson*, 555 U.S. at 231.

<u>COUNT XI</u>
**Sex Discrimination and Retaliation**
**Michigan's Elliott-Larsen Civil Rights Act**
**M.C.L. §§ 37.2202 *et seq*.**
**(All Defendants)**

484.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

485.     Defendants are employers within the meaning of ELCRA.

486.     Plaintiff is an employee within the meaning of ELCRA.

487.     ELCRA prohibits an employer from discriminating against an employee on the basis of sex.

488.     ELCRA also prohibits retaliation and discrimination "against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing." M.C.L. 37.2701(a).

489.     Plaintiff, as a Latina and Native woman, is a member of several protected classes.

490.     Defendants discriminated against Plaintiff by failing to comply with the procedures and timelines outlined in their own RVSM Policies, failing to timely investigate and respond to Defendant Norder's ongoing harassment of her, failing to ensure that the effects of Defendant Norder's discrimination against her were fully remedied, failing to respond appropriately to her reports of retaliation by Defendant Norder, and failing to adequately train and supervise their staff with respect to the handling of Title IX complaints.

491.     Defendant Tyler discriminated against Plaintiff by failing to approve the accommodations she needed to do her job, such as allowing her to get a new desk and providing her assistance with cleaning out her abuser's desk; threatening her with removing

her unit from CANR whenever she raised concerns about abuse she was experiencing, and ignoring her repeated reports of abuse.

492.     Defendant Norder discriminated against Plaintiff by repeatedly sexually harassing and stalking her.

493.     Defendant Norder retaliated against Plaintiff by continuing to stalk and harass her after she reported him to OIE.

494.     Defendants' actions were intentional, with deliberate disregard for Plaintiff's rights and sensibilities.

<u>**COUNT XII**</u>
**Disability Discrimination and Retaliation**
**Michigan's Persons with Disabilities Civil Rights Act**
**M.C.L. §§ 37.1101 *et seq.***
**(All Defendants)**

495.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

496.     Defendants are employers within the meaning of PDCRA

497.     Plaintiff is an employee within the meaning of PDCRA.

498.     PDCRA prohibits an employer from discriminating against an employee on the basis of disability

499.     PDCRA also prohibits retaliation and discrimination "against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing." M.C.L. 37.1602(a).

500.     Plaintiff is a person with a disability, and/or was regarded as having a disability by Defendants, and thus is covered by PDCRA.

501.     Plaintiff's condition substantially interferes with one or more major life activities.

502.     Plaintiff's condition does not prevent her from performing the duties of her job.

503.     Defendants discriminated against Plaintiff by directly discriminating against and harassing her, failing to timely investigate and respond to Defendant Norder's ongoing harassment of her, failing to ensure that the effects of Defendant Norder's discrimination against her were fully remedied, failing to respond appropriately to her reports of retaliation by Defendant Norder, and failing to adequately train and supervise their staff with respect to the handling of discrimination complaints.

504.     Defendant Tyler discriminated against Plaintiff by failing to approve the accommodations she needed to do her job, such as allowing her to get a new desk and providing her assistance with cleaning out her abuser's desk; threatening her with removing her unit from CANR whenever she raised concerns about abuse she was experiencing, and ignoring her repeated reports of abuse.

505.     Defendant Norder discriminated against Plaintiff by repeatedly harassing her based on her disability.

506.     Defendant Norder retaliated against Plaintiff by continuing to stalk and harass her after she reported him to OIE.

507.     Defendants' actions were intentional, with deliberate disregard for Plaintiff's rights and sensibilities.

## **DAMAGES**

508.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

509.     As a direct and proximate result of the above-described conduct, Plaintiff suffered general, special, incidental, and consequential injuries and damages, past, present, and future, in excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at the time of trial. These past, present, and future damages include, but are not limited to, the following:

   a.  Physical injury and suffering;

   b.  Pain, suffering, mental, and emotional distress;

   c.  Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, and humiliations;

   d.  Loss of her constitutional rights;

   e.  Loss of employment opportunities;

   f.  Damage to her professional reputation;

   g.  Weight loss;

   h.  Post-traumatic stress disorder;

   i.  Anxiety;

   j.  Depression;

   k.  Sleep disturbances and nightmares;

   l.  Hypervigilance;

   m.  Economic loss;

   n.  Loss of the ordinary pleasures of everyday life;

   o.  Loss of relationships;

   p.  Travel and travel-related expenses;

q.  All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## RELIEF REQUESTED FOR ALL CAUSES OF ACTION

For all the foregoing reasons, Plaintiff prays for judgment against Defendants as follows:

A.  For past, present, and future non-economic damages in an amount to be determined at trial;

B.  For past, present, and future general, special, incidental, and consequential damages in an amount to be determined at trial;

C.  For any appropriate statutory damages;

D.  For costs of this suit;

E.  For punitive damages, according to proof, as appropriate to the individual cause of action;

F.  For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

G.  For reasonable attorneys' fees, costs, and interest, to the fullest extent allowed by law; and

H.  All such additional and/or further relief as this Court deems just and equitable under the circumstances.

## JURY DEMAND

Now comes Plaintiff, by and through her attorneys, Elizabeth K. Abdnour and Karen Truszkowski, and demands a trial by jury.


Dated: January 19, 2022


Respectfully Submitted,

**s/ Elizabeth K. Abdnour** P78203
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Fax: (517) 292-0067
Email: elizabeth@abdnour.com

**s/ Karen Truszkowski** P56929
TEMPERANCE LEGAL GROUP, PLLC
1100 W. Saginaw St., Ste. 4A-1
Lansing, MI 48915
Telephone: (844) 534-2560
Fax: (800) 531-6527
Email: karen@temperancelegalgroup.com

*Attorneys for Plaintiff*